WRIGHT v. WARREN BROS. CO.

(Circuit Court of Appeals, Fourth Circuit. February 18, 1913.)

No. 1,117.

1. CORPORATIONS (§ 294*)—OFFICERS AND AGENTS—TENURE OF APPOINTMENT—WEST VIRGINIA STATUTE.

Within the meaning of Code W. Va. c. 53, § 53, which provides that the board of directors of a corporation may appoint such officers and agents of the corporation as they deem proper, who shall hold their places during the pleasure of the board, a general manager, appointed for the business of the corporation in another state, is such an agent, and not an ordinary employé, and under the construction placed on such provision by the highest court of the state he cannot enforce a contract

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

for his employment for a definite term of years, but holds his position subject to discharge by the board of directors at any time.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1263–1266; Dec. § 294.*]

2. CORPORATIONS (§ 308*)—AGENTS—CONTRACT OF EMPLOYMENT.

Having such power of discharge under the law, the board of directors could not bind the corporation by contract to pay such manager an advance salary for three months in case of his discharge.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1334–1349; Dec. Dig. § 308.*]

3. CORPORATIONS (§ 308*)—STOCKHOLDERS—CONTRACTS WITH OFFICER—LEGALITY.

To render void, as against public policy, a contract by a stockholder in a corporation to pay a salary to an officer of the corporation, it should at least be shown that there are other minority stockholders, and that the contract was made without their knowledge or consent.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1334–1349; Dec. Dig. § 308.*]

4. CORPORATIONS (§ 308*)—ACTION AGAINST CORPORATION ON CONTRACT—DEFENSES.

In an action against a corporation on a contract, defendant cannot set off an indebtedness from plaintiff to a subsidiary corporation of defendant, in which it is the sole or controlling stockholder, unless in case of fraud or other special circumstances; but, where the contract sued on was one to pay plaintiff a salary as an officer of the subsidiary corporation, defendant is entitled to prove any fact showing that plaintiff did not faithfully discharge his duties as such officer, and hence is not entitled to the salary promised.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1334–1349; Dec. Dig. § 308.*]

In Error to the District Court of the United States for the Southern District of West Virginia, at Charleston; Benjamin F. Keller, Judge.

Action at law by John M. Wright against the Warren Bros. Company. Judgment for plaintiff, and both parties bring error. Reversed.

Price, Smith, Spilman & Clay, of Charleston, W. Va., and J. B. Cessna, of Erie, Pa., for plaintiff.

T. S. Clark, of Charleston, W. Va., and Arthur Drinkwater, of Boston, Mass. (J. M. Head and Chilton, MacCorkle & Chilton, all of Charleston, W. Va., on the briefs), for Warren Bros. Co.

Before GOFF and PRITCHARD, Circuit Judges, and ROSE, District Judge.

ROSE, District Judge. John M. Wright was the plaintiff below. He will be here designated as such. He is a citizen of New York. Warren Bros. Company was the defendant. It will be so called. It is a West Virginia corporation. The plaintiff brought suit for what he claimed to be a balance due him under a contract by which he said he had been employed by the defendant. He obtained a judgment below for $21,798.05. The defendant sued out a writ of error. The judgment was for much less than the plaintiff's claim. He took a cross-writ.

It will be more convenient to deal in the first place with the questions raised by his assignments of error. For that purpose we may assume in his favor many things which the defendant disputes.

The plaintiff says that he had a contract with the defendant by which he gave it the right to command his services for a period of ten years. His salary for the first year was to be at the rate of $6,000 per annum. For five years he was annually to receive in addition $4,000 of the defendant's common stock. In certain contingencies, the defendant was, after the first year, to increase his income directly or indirectly by dividends on the stock, by bonus, or by salary by not less than $1,000 per year, until his income should reach $10,000 per annum from the business. The contract contained a provision that, in case of plaintiff's dismissal for any cause within the ten years, he was to receive the balance of the common stock due according to the agreement before the dismissal was effected. By another paragraph of the agreement defendant promised, if, at any time after the first year, it dispensed with his services, to give him three months' notice in writing, or in lieu thereof to pay him three months' salary, computed at the monthly rate for the year in which he was then working.

The plaintiff says the defendant discharged him on the 17th of May, 1907, without giving him three months' notice in writing, and without paying him in lieu thereof three months' salary. Up to that time he had received only $4,000 of the defendant's common stock. The $4,000 per annum of said stock for the remaining four years has never been delivered to him. The plaintiff contends that its delivery to him was a condition precedent to the defendant's exercise of the right to dismiss him. The plaintiff says until the stock was delivered to him he was entitled to his salary up to the time of the trial, less the amount he might have earned elsewhere in the meanwhile.

[1] The refusal of the court below to permit a recovery upon this theory, and its rejection as irrelevant of evidence of the plaintiff's earnings between the date of his discharge and the trial, are assigned by him for error. The court refused to construe the contract as making the prior delivery of the stock a condition precedent to the exercise of the right of dismissal. In this we think it was right; but, even if we did not, the plaintiff would not have been entitled to recover anything for services after the time at which the defendant had discharged him.

Section 53 of chapter 53 of the Code of West Virginia, among other things, provides that the board of directors of a West Virginia corporation, which defendant was, "may, subject to the provisions of the law and the by-laws, appoint such officers and agents of the corporation as they may deem proper. * * * The officers and agents so appointed shall hold their places during the pleasure of the board." The construction placed upon this statute by the highest court of the state is binding upon us. That court has held that the purpose and effect of the provision in question is to inhibit the employment by the board of a corporation of such officers or agents for a definite period of time. In its language:

"They are not permitted thus to handicap the company in the conduct of its business." Durrah v. Wheeling Ice & Storage Co., 50 W. Va. 417, 40 S. E. 373.

By the terms of the contract sued on, the plaintiff was to have the general management of defendant's Michigan business under the general direction of defendant's president. His duties, therefore, were of an executive character. Within the principles laid down in Munn v. Wellsburg Banking & Trust Co., 66 W. Va. 204, 66 S. E. 230, 135 Am. St. Rep. 1024, he was an agent of the defendant as that word is used in section 53 of chapter 53, and was not merely an ordinary employé.

This conclusion disposes of all the plaintiff's assignments of error, except that which is based upon the court's refusal to permit him to testify as to a conversation with the president of the defendant at the time of the writing of the letter which embodied the terms of the contract.

Plaintiff's counsel argued that, in view of the fact that this letter contemplated the making of a subsequent formal contract, which was, however, never made, the agreement between the parties might well have been partly in writing and partly by parol. It is not necessary to discuss this contention.

As we shall see when we come to consider defendant's assignments of error, the contract was not binding upon the latter until ratified by its board of directors. The only action taken by the board was a resolution, passed some months after the letter was written, authorizing the defendant's president to make a contract with the plaintiff upon the general lines of the correspondence already had. Such authority was clearly based upon the *correspondence,* and not upon conversations not therein embodied.

Consideration of the defendant's assignments of error require a fuller statement of the terms of the alleged contract and of the facts and circumstances in evidence.

As already stated, the letter said to be a contract provided that the plaintiff was to have the general management of the defendant's business in Michigan. In strict theory of law the defendant, during the time the plaintiff says he was in its employ, did no business in Michigan, or none of any importance. In that state and in many others it did not operate directly in its own name. Its transactions were carried on through subsidiary companies. It actually, if not always, nominally held a large majority, if not absolutely all, of the stock of these companies. They were under its control. One of them was the Central Bitulithic Company. For brevity it will be called the Central Company. It was also a West Virginia corporation. It was through this Central Company that the defendant carried on business in Michigan.

Within a few days after writing the letter which plaintiff says constituted, or at all events in part evidenced, the contract upon which he sues, the defendant caused him to be elected president of the Central Company. It had some shares of stock put in his name. The certificate therefor he immediately returned to it, so indorsed that it could at any time cause the stock to be transferred to itself or to any one else. When it wanted to end his employment, it had this stock transferred to another name. Under the by-laws of the Central Company, when he ceased to be a stockholder he was no longer qualified to hold

the office of president. It was in this way, and apparently in this way only, that the defendant discharged him.

During the four years and a little over in which he was, as he claims, in the defendant's employ, his salary of $6,000 per annum, or $500 a month, was paid by the Central Company. It does not appear that he was ever given anything directly by the defendant company, except $4,000 of its common stock. All he received, either from the defendant or the Central Company, during the time of his employment, was $6,000 a year and this $4,000 of stock. By the terms of the letter upon which he sues he should have annually received during the four years he was in the defendant's employ $4,000 of such stock. The learned judge below held that, as he was in that employ for four years, he was entitled to $16,000 of stock. He had received only $4,-000. He had a just claim to $12,000 more. By the letter the defendant bound itself to buy at the end of ten years, or say on May 1, 1913, the common stock given to the plaintiff, and to pay par for it. The case went to the jury below on the 7th of December, 1911. The present value of $12,000, payable May 1, 1913, was then $10,988.

By the terms of the letter the plaintiff's salary in certain contingencies, which actually happened, was to be increased $1,000 a year until it reached $10,000 per annum. He was, however, to treat as part of his salary any dividends he received upon the common stock which was given him. On May 17, 1907, the date of his dismissal, there was due and unpaid him for this promised augmentation in salary the net amount of $6,022.78. The interest thereon to the time of trial footed up $1,890.35. In addition, the court held that under the terms of the contract he was entitled to three months' salary in lieu of notice. Such salary, it determined, was to be calculated at the rate his salary would then have been, had the increase of $1,000 a year been made. If it had been, he would have been receiving, beginning May 1, 1907, $10,000 per year. Three months' salary at that rate would be $2,500. Although he was discharged as of May 17, 1907, he had, prior thereto, collected his salary for the entire month of May at the rate of $6,000 per annum, or $500 a month. At that rate the salary from the 17th to the 31st of the month amounted to $225.81. The verdict below accordingly allowed him $2,500 less $225.81, or $2,274.19, and interest thereon from May 17, 1907, to trial, or $622.73. The present value of defendant's contract to give him $12,000 of common stock and to buy it from him at par on May 1, 1913, and the annual augmentations of salary he was to receive, and salary for three months in lieu of notice, together with interest on the two last-named sums, foot up the amount for which the plaintiff below recovered judgment.

[2] We have held that the plaintiff was an agent of the defendant within the meaning of section 53 of article 53 of the Code of West Virginia. As such the corporation, acting through its board of directors, had the right to dismiss him at any time. The board could not bind the corporation to pay a penalty if it saw fit to exercise a privilege that the law of the state made inalienable. It follows that the plaintiff was not entitled to recover this sum of $2,274.19, or the interest thereon, $622.73, a total of $2,896.92.

It does not appear that the defense under this statute was ever in any way taken by the defendant in the court below. Under such circumstances, it could not for the first time make the contention here; but as the point has been fully argued before us, and as the case will for other reasons have to be sent back for a new trial, we have thought it best to say about it what we have.

At the time the alleged contract was entered into the plaintiff was a director and vice president of the defendant. He remained such for about a year thereafter, if his apparently somewhat vague recollection on the subject is accurate. The defendant here argues that under the law of West Virginia no salary or compensation can be allowed a president or director for services as such without the approval of the stockholders. It is admitted that the contract between the defendant and the plaintiff was never laid before the stockholders of the former. It does not appear from the record that this objection was made below. Under such circumstances, all that need be said is that the statute does not apparently prohibit absolutely all compensation to any president or director unless the stockholders approve, but only such compensation as shall be paid him for his services as president or director. When the case is again tried, the defendant may, if it be so advised, set up this defense. The question will then have to be determined whether, upon the evidence, the services rendered by the plaintiff were rendered as a director of the defendant. If they were not, the provision of the statute now under consideration would appear to have nothing to do with the case.

[3] In the court below the defendant strenuously insisted, as he here insists, that the contract was void, even if both the parties to it had in fact attempted to make it. According to this contention it was void because sound public policy does not permit any holder of the stock of a corporation to place the officers thereof under special and peculiar obligation to him or it by agreeing to pay him something beyond that which he receives from the corporation in return for what he does for it. In support of this contention it cites West v. Camden, 135 U. S. 507, 10 Sup. Ct. 838, 34 L. Ed. 254; Seymour v. Detroit C. & B. Rolling Mills, 56 Mich. 117, 22 N. W. 317, 23 N. W. 186; Wilbur v. Stoepel, 82 Mich. 344, 46 N. W. 724, 21 Am. St. Rep. 568. None of these cases sustain defendant's contention in the broad form in which it is made. They do hold that it is contrary to public policy for a stockholder in a corporation, who does not own all the stock, so to bind himself by contract that he will be liable in damages if the other party is not kept in office by the corporation.

The contract sued on in this case does not in form undertake to make or keep the plaintiff an officer of the Central Company. The defendant binds itself to commit to him the general management of its Michigan business. It may have been, and the record shows that it was, in the contemplation of the parties that the defendant should operate its business in Michigan through the Central Company. So far, however, as the agreement between plaintiff and defendant was concerned, the defendant could have at any moment changed its mind in this respect, without the plaintiff having any right to complain. He was entitled, so long as he remained in defendant's employ, to man-

age its Michigan business. It was for it to say whether it would or would not use the Central Company in connection with that business, and to what extent. Moreover, all the cases hold that such contracts, when void, are so because they are made without the knowledge and consent of minority stockholders. If enforceable, the majority cannot permit the removal of the other contracting party from his corporate office or employment, except at the risk of exposing themselves to personal liability to him.

When the reason for the rule does not exist, the rule is inapplicable. The defendant has not affirmatively shown that there were, otherwise than in name, any other stockholders in the Central Company. It is agreed that at all times the defendant owned 90 per cent. of the Central stock. The defendant sets up this defense. The record shows that the connection between it and the Central Company was most intimate. If it be a fact that the Central Company had other stockholders than the defendant, that such other stockholders had an appreciable pecuniary interest in it, and did not know of the contract with the plaintiff, it will be easy for the defendant to prove such facts. We think the burden of proof is on it. If there shall be a new trial of the case, the defendant may, if it wishes, show precisely who the stockholders of the Central Company were at the time the contract was made, and at any other times which it may think relevant, and what the amount and character of their holdings were.

The defendant says that in any event such a contract as that sued on in this case is beyond the corporate powers of the defendant corporation. It admits that such powers are broad. There is no question that it is expressly authorized to hold stock in such a corporation as the Central Company; but even under such circumstances, it argues, it may not use or contract to use its funds in augmenting the salary of one who is serving it, if he is serving it at all, only as an officer of a corporation in which it is a stockholder. The rules of law which should be applied to relations between one corporation and another in which it is a stockholder are still to a large extent in the making. It is quite possible that they are and should be different, when there are other real and substantial holders of stock, from what they are when to all practical intents and purposes the other corporation is the sole holder. The relation between these two corporations in this respect will doubtless be clearly shown at a new trial, if one is had. Until then we prefer not to deal with what well may become moot questions.

The defendant's assignments of error thus far discussed, so far as they were raised below at all, arose either out of the action of the court in overruling the defendant's demurrer to the plaintiff's declaration, or out of its rejection of defendant's prayer for an instructed verdict.

The defendant says there are other reasons why it was entitled to such an instruction. It claims the letter sued upon upon its face shows that a formal contract was to be substituted for it; that the contract was the act of the president alone, and was not binding upon the defendant unless and until it was ratified by its directors; and

that the plaintiff, by accepting the presidency of the Central Company and receiving salary therefrom, voluntarily rescinded or abrogated his contract with the defendant.

There was evidence in the record from which it might be found that the parties subsequently mutually agreed that it was unnecessary to formulate any other contract; that the letter of April 23d sufficiently embodied the agreement between them; that such contract was afterwards ratified by the defendant's board of directors; and that neither party considered the acceptance by the plaintiff of the presidency of the Central Company as anything else than one of the things he was expected to do under the contract.

In so far as these issues depended upon the construction of written instruments, they were for the court. So far as they in whole or in part turned upon the conclusions to be drawn from oral testimony, they were for the jury. We see no error in the action of the court below with reference to them.

We come now to the consideration of the more difficult portion of the case.

[4] Defendant had offered to prove that plaintiff had taken $10,-785.60 out of the treasury of the Central Company and had never accounted for it. The court excluded such testimony. Defendant could not set off against what it might owe the plaintiff specific sums due by the latter to the Central Company. Its relations to its subsidiary corporation and to the other stockholders therein, if any there were, might be such that it would be bound by a contract to pay for services rendered to the company in whose prosperity it was so greatly interested. It does not follow that it can in its own name or right recover debts due the Central Company.

One corporation often finds it convenient to operate through another company, all or the majority of whose stock it owns, and whose operations it absolutely controls. Those who manage such corporations have a keen appreciation of one ultimate fact. They know that the subsidiary corporation must do whatever the controlling corporation demands. They not infrequently pay little attention to the form in which legal theory requires that corporate action shall be taken. Substantial rights thus become entangled in a mesh of legal difficulties and perplexities, both of substance and of procedure. Sometimes justice can be done only by cutting through this net, or by pushing it bodily aside. When fraud cannot be otherwise prevented, such course has often been taken. No new principle is thereby established. There is no promulgation of a doctrine which may logically lead to consequences undreamed of by the judge or chancellor who proclaimed it. Nothing more is done than to make a new application of the old rule that the courts will strip from fraud whatever mask it may assume.

There may be other circumstances under which a court would be justified in ignoring the corporate form given to the transaction, in order that right may be done to the interests involved. Whether this ever can be done, and, if so, under what circumstances, need not be here determined. It certainly ought not to be attempted unless jus-

tice cannot be otherwise attained, or unless the doing of it is in accordance with some legal principle which can properly be applied to all like cases. We know of no rule which, under the circumstances of this case, would permit the setting off against a debt due by a controlling corporation to a third party of an indebtedness of such third party to a subsidiary company.

Right and justice may be done to the defendant without making new law. The plaintiff says that substantially the whole of the services for which the defendant promised to pay him were to be performed for the Central Company. It was implied in his undertaking, as in all such contracts, that he was to discharge his duties honestly and faithfully. If he did not, he was not entitled to the compensation agreed to be paid him. Whatever his rights might be in a suit upon a quantum meruit, he could not in such case recover upon a special contract. We think, therefore, that the defendant was entitled to prove, if it could, that the plaintiff had not accounted for a large sum of money belonging to the Central Company, and which he had taken from the latter, and that it should have been allowed to do so.

By his contract he undertook to operate the promotion part of the business at an expense not to exceed 20 cents per square yard of pavement laid, and that he would take no work which would not show a profit when the calculations were made in a certain definite way. Defendant offered to prove that the promotion expenses of the Central Company during the time its operations were controlled by the plaintiff greatly exceeded 20 cents per square yard, and that much work was undertaken which did not show a profit according to the standard set up in the contract. It appears to us that this was its right, and that the refusal to permit it so to do was error.

There would seem to be only two possible contentions open to the plaintiff. Either he was to serve the defendant directly and exclusively, or he was to serve it by managing the Central Company. Upon the former alternative his contract would have ended when he entered into the employ of the latter. He claims that his agreement contemplated that he was to act through the subsidiary corporation. We have held that he was entitled to take such position. It necessarily follows that the conditions under which he undertook to do the work are applicable to what he did for that company.

Plaintiff says that he did not agree to keep promotion expenses down to 20 cents a yard and to show a profit in all the work which he took. He claims that the language in the agreement upon which defendant bases the contention that he did so is nothing more than the expression by him of an expectation that he would be able to achieve those desirable results. We cannot agree with him. There is nothing in the language of the contract which would justify such a construction. There is nothing ambiguous about it, nor is the interpretation we give it in any wise unreasonable as viewed from the position in which the parties stood at the time it was entered into. The plaintiff was then in the employ of the defendant. He was receiving a salary of $3,000 a year. Its Michigan business was in bad shape. He was

put in charge of it. He promised to attain certain specified and highly advantageous results. It promised to pay him a greatly increased compensation. Defendant could, if it had seen fit, have waived the performance by the plaintiff of the whole or any part of what he undertook to do. We do not find in the record any documentary evidence that it did so. As a rule, whenever he asked the defendant for any of the sums for which he is now suing his attention was called to the fact that the business had not been profitable and that the promotion expenses had been too great. If there is any other evidence that the defendant waived its right to rely upon the plaintiff's breach of these undertakings on his part, it was a question for the jury under proper instructions from the court. We find nothing in this record which would justify us in holding that as a matter of law such waiver had been shown.

The judgment below must be reversed, and a new trial granted. Reversed.